26b 177
153a 446

BENOIT JULIEN CAUJOLLE, appellant, *vs.* JOHN P. FERRIE, respondent.

By the common law, to constitute a valid marriage, no ceremony, or solemnization by minister, priest or magistrate is necessary. A marriage is complete when there is a full, free and mutual consent, by parties capable of contracting; even when not followed by cohabitation.

The common law *presumes* marriage; that is, it presumes every man legitimate, until the contrary is shown. And suspicions, or conjectures, or rumors, are not sufficient to rebut this presumption.

The common law will also *infer* a contract of marriage, from circumstances; but not where the impediments of pre-contract, consanguinity, affinity, or corporal or mental incapacity exist.

Although these principles of the common law originated in the canon law, which at one time prevailed throughout christendom, yet in many if not in most of the nations of the continent of Europe, a formal solemnization became necessary, to constitute a valid marriage.

In a country where the law requires the solemnization of a marriage, according to settled forms, in the absence of direct proof of this solemnization, it may be inferred from circumstances, as the common law allows in places where the common law prevails.

This rule is not restricted by any consideration of the place where the contract was made. The *lex loci*, as to the manner in which the contract should be made, will prevail; but the method of determining whether the *lex loci* was complied with, will necessarily be regulated by the *lex fori*.

What evidence is sufficient, in our courts, to authorize them to infer a marriage in conformity with the French law existing at the time when the marriage is alleged to have taken place.

Where the legitimacy of a person is in question, the declarations of his mother are admissible after her death, being connected with a question of pedigree; if not made *post litem motam.*

Where a man and woman, residing in France, publicly avowed their intention to marry, and in consequence of his persisting in that determination the man was compelled to leave his father's house, and the woman her situation as a domestic in another family; and they formally published, as the law directed, their intention to be married at a specific time; which was followed by their living together as man and wife, in a household of their own, the woman bearing the name of the man, and being addressed and spoken of as his wife, by him and their neighbors; by the birth of a child, and the performance of the rite of baptism in the presence of the putative father and members of his family; and the woman repeatedly declared that she had been married to the man, and that she was the mother, and he the father, of the child; *it was held* that the proof was sufficient, after a great lapse of

Caujolle *v.* Ferrie.

time, to warrant the court in pronouncing in favor of an actual and suffi-
cient contract of marriage between the parties, previous to the birth of the
child, and of the child's legitimacy. MITCHELL, P. J. dissented.

APPEAL from a decision of the surrogate of the county of
New York, granting letters of administration to the re-
spondent, John P. Ferrie, upon the estate of Jeanne Du Lux,
who died in the city of New York, in November, 1854, intes-
tate. The facts are fully stated in the report of the case before
the surrogate, (4 *Brad.* 28,) as well as in the following opinion
of Justice CLERKE. They therefore need not be detailed here.

*John Jay,* for the appellant.

*F. Ball,* for the respondent.

CLERKE, J. This is an appeal from the decision of the sur-
rogate of the county of New York, decreeing that letters of
administration issue to John P. Ferrie, as next of kin to Jeanne
Du Lux, a widow, who departed this life in November, 1854,
intestate.

The personal estate of the decedent, amassed by her while
trading in the city of New York, probably exceeded the sum
of $100,000; and as none of her kin resided in New York,
the surrogate, in the first instance, granted letters of collection
on her estate to the public administrator. On the 11th day
of December, 1854, Ferrie filed his petition with the surro-
gate, praying letters of administration on the estate of the
decedent, on the ground that he was her child, and her only
child, and consequently, her sole next of kin and heir. This
was denied by the public administrator, and by distant rela-
tives of the decedent, named Caujolle, natives and residents of
France. The questions involved in the contest were, 1st,
whether Ferrie was the son of the decedent, and 2d, if her
son, whether he was legitimate.

Jeanne Du Lux was a native of Pau, Province of Bearn,
in France, and was born November 24th, 1777. She was the

daughter of John Icard and Magdalene Reviere, who had been previously married to Antoine Dezeille, by whom she had a son, named Benoit. Jeanne and a son, named Paul Alexis, were the fruit of the second marriage. John Icard, Jeanne's father, died in 1785. It is uncertain at what time Jeanne's mother died; but it is probable she survived her husband only a few years. Some years after the decease of her father, Jeanne went to Massat, Castillon, and St. Girons; she also went to Biert, where her mother had resided, and where several of her maternal relatives still resided. In 1797 and 1800 she was employed as a domestic by Anere, a merchant of St. Girons. At this place, previous to the year 1800, she formed an intimacy with Valentin Ferrie, son of Belthazar Ferrie and of Frances Cazes.

Belthazar Ferrie was a tanner, and a resident of St. Girons. When he first heard of the intimacy of his son with Jeanne Icard, he was very much displeased; and, when he found that Valentin declared it was his intention to marry her, he refused to hold any intercourse with him. Valentin soon left his father's house, and he and Jeanne Icard went to live together in a part of a house, belonging to Mr. Benoz at St. Girons, at the entrance of the city. They continued to cohabit together: it does not appear very satisfactorily how long; but during this period, in June, 1800, the respondent was born at this house. Valentin was present at the birth, and acted in the usual way in which any father in lawful wedlock would act on such an occasion. He had the child baptized by the curé of Ledor, as appears from the baptismal records of the church, in which he is stated to be Belthazar Pierre Ferrie, the son of Valentin and of Jane Icard—godfather *Belthazar Ferrie*, and godmother Rose Ferrie. The child (as is very usual in France) was put to nurse with country people, with the concurrence and consent of both parents, who continued to live together in the same intimate relation for some time, but how long it is impossible to infer from the testimony, which is very unsatisfactory on many points, particularly

dates. They must have separated, or discontinued their connection, long before the death of Valentin Ferrie, which occurred probably in 1811. He was killed while conveying goods to the French army in Spain. There is some evidence that both left St. Girons together, and went to Bordeaux; here, some short time previous to 1806, she became acquainted with Henry Du Lux, her future husband, in the house of Mr. Catelan, a silk merchant in that city. In 1806 she and Du Lux arrived in the city of New York, where she continued to reside until her decease in 1854. She engaged in business here, and cohabited with Du Lux until the 17th June, 1812, when they were formally married, in conformity with the French law, at the house of the consul general of France. Du Lux soon after went back to Bordeaux, but returned in 1813. In the summer of 1814 he again went to France. He wrote to his wife from Paris in December, 1814, complaining that she had refused to honor his draft, and stating, in consequence of her unkindness in this respect, that he would not return to New York. From that time nothing positive was heard from him until 1822, when he sent a communication from the Isle of France to Mr. De Guene, of this city. Nothing has been heard of him since that time. From the information furnished by the testimony, relative to the brother and half brother of the decedent, enough appears to warrant the presumption of their death without issue.

When Du Lux went to Bordeaux in 1812, he commenced an inquiry, at the request of the decedent, for the respondent Ferrie; Du Lux did not succeed in obtaining any positive information respecting him; and it was not until 1815, when the decedent visited her native country, that she succeeded in finding him. She placed him in a school in Bordeaux, and proceeded to Paris; a night or two, however, after his arrival, he fled, and returned to the mountains, where he had been brought up. Madame Du Lux returned to New York; but in a short time Ferrie was discovered and taken to St. Girons, his birth-place, and was placed under the care of Mr. Anere,

who promised to take charge of his education. He remained there until 1821, when the decedent, having received no information of him for several years, Mr. Catelan of Bordeaux, employed a traveling agent to make inquiries respecting him at St. Girons. Although Anere had been regularly supplied with funds for his use, the young man was found totally neglected, clothed in rags, and employed as a servant. He was then sent again to Bordeaux, where he remained with Mr. Catelan until 1824; when, principally for the purpose of avoiding the conscription, he was secretly placed on board a vessel bound for America. He lived here some time with Madame Du Lux; but her capricious and violent temper rendered it impossible for him to continue with her; and he at length established himself, as a hair dresser, in Cincinnati. He, subsequently, kept up no regular correspondence with the decedent; but he wrote occasionally to her; and, on several occasions, when he came to New York, he visited her. She was severely injured by coming in contact with a wagon in the street, in 1854, and died in consequence, at the hospital of the Sisters of Mercy, on the 16th November, 1854.

I. I have no doubt that Ferrie was the son, and not the nephew, of the decedent, notwithstanding that in all her correspondence for a number of years, she uniformly referred to him as her nephew. There is no evidence, however, that she had a sister, or that either of her brothers was married, or ever had any children.

The evidence is incontrovertible, on the other hand, that she had *a* son, and that, although she had repeatedly spoken of the respondent as her nephew, she more frequently, in confidential conversations, and, latterly, almost uniformly spoke of him as her son, and in those conversations she discloses one reason why she called him nephew. M. Daguene says that in 1819, when Du Lux had gone away, she told him, " I cannot call him (Ferrie) my son; the fellow looks too old ;" and afterwards, " I can't call him my son, he is too old." There is other testimony that this vanity, which lingered in

her to the latest years of her long career, induced her, often, to address him as her nephew; although, at a more early period of her life, she might have been influenced by other motives. In nearly all her intercourse with Ferrie, since his arrival in this country, she treated him, and spoke of him, as *her son.* To some of the witnesses, and particularly to Madame Grieser, she spoke explicitly and specifically on the subject. The witness said to her, " You never got children." She replied, " Oh, yes, you are mistaken. I had one in France when I was very young. I had to send money to support him when he was at nurse." She further said, " I was married in France in the revolution times." And afterwards, to this same witness, during her last illness, she said that she had been married in France in the time of the revolution. To Daguene she said, she was very young when she had the child, speaking of Ferrie. This witness adds, that she spoke of his father, " and I took it for granted, that she was married." To Mrs. Creighton, who had known her 25 years, she said, "she had *one* child when she was quite young ; she said she was married very young, and this child born about fifteen"— her predominant vanity prompting her to state, that this event occurred when she was several years younger than when it really occurred. Although speaking of Ferrie afterwards, she spoke of him to this witness as her nephew. To Madame Bamans, who lived some time in the house in William street with her, she said, " she had never had but *one* child, and that was a boy, that she had him in France. She said she left him at a nurse's in France, when she came over." In speaking to Madame Du Fau of Ferrie, as her son, she said, " the father of that young man is dead ;" and on this occasion she particularly explained to the witness the manner of his death. Henry Martin testifies that she said when she was very angry, " I should not call him my son, but my nephew," but next day, she would say, " he is my son." " Sometimes, she showed much affection and feeling for him. She would cry, sometimes, and say he ought to come to New York again and

live there, they were so far from each other;" and again, " I was speaking to her of the same accent that she and Ferrie had;" she said, " Oh, yes, we are born in the same province in France !" I said to her, " Oh ! he is your son ; he has the same voice and expression." She said, " every body says he looks like me ; of course he is my son." After a diligent, and, for some time, an ineffectual search for the respondent, when she discovered him in the lower Pyrenees, at the age of nine years, " she told him he was her son." She said " this is my son. I came to fetch him." She took him away with her. The first recollections of Ferrie himself were of living at a place about nine miles of St. Girons ; the birth place of the child, born in June, 1800, when she cohabited with Valentin Ferrie.

The respondent testifies that he lived there with country people. The woman who nursed him died while nursing him, and he was recommended to another person in the lower part of the Pyrenees. He always went by the name of Ferrie, on the mountains. She called him by that name when he came to this country. " She said she did not like my father, because he did not see me often enough, while I was at nurse ; that he was a rough kind of man, and did not treat her very well. My father's name was Ferrie."

Thus, to various witnesses, and on occasions demanding and eliciting a greater degree of candor and deliberation than she usually exhibited, she not only in general terms declared the respondent to be her son, but specified with some detail the circumstances of his birth, the character and fate of Valentin Ferrie, and her early connection and marriage with him. This is very different from merely *mentioning* him as her son. There is only one instance, I believe, in which she specified any circumstances in speaking of a nephew ; and, on that occasion, she did not speak of the respondent as her nephew. This was when she stated to Mary Morrison that she had had a sister in France, who died and left two children, a boy and a girl ; that she took the children, and took

the nephew when he was thirteen years of age. "She said the child had died." But no part of the testimony proves that she ever had a sister who arrived at maturity. She only had the brothers whom I have already mentioned. We find, therefore, in referring to the respondent as her nephew, which she undoubtedly did, in a great number of instances, and for a series of years, that she merely *called* him her nephew; while, on the other hand, she not only repeatedly called him her son, but on several occasions accompanied the appellation by a statement of facts; by poignant and unremitting anxiety; by the expenditure of considerable sums of money for his education and support, and by the manifestation of an affection, which, notwithstanding her early neglect of him, and her subsequent violent and capricious conduct towards him, seemed to have partaken, in some degree, of the yearnings of maternal love. Their great resemblance to each other, in voice and visage, may be mentioned as a strong proof of this near relationship. Many of the witnesses were particularly struck with this resemblance; and, although a nephew may possibly bear as strong a resemblance to an aunt, as a son to a mother, this is not generally the case. We find, besides, *that she had no nephew;* and if the respondent was not her son, he must have been only a distant relative, or not related to her at all.

It may be safely assumed, therefore, that the respondent was the son of the decedent and of Valentin Ferrie.

II. Was he their legitimate son? There is, certainly, an absence of direct specific proof of any *solemnization* of a marriage between her and Valentin Ferrie. Is it necessary, however, in order to decide, whether there was a valid marriage, that there was a formal solemnization of it?

The principles of the common law respecting marriage, are few and simple. It requires no ceremony, no solemnization by minister, priest, or magistrate. A marriage is complete when there is a full, free and mutual consent by the parties capable of contracting, even when not followed by cohabitation.

Caujolle *v.* Ferrie.

I refer to a few prominent cases in the courts of this state declaring these principles. (*Jackson* v. *Winne,* 7 *Wend.* 47. *Fenton* v. *Reed,* 4 *John.* 52. *The People* v. *Humphrey,* 7 *id.* 314. *Starr* v. *Peck,* 1 *Hill,* 270.) Such was the simplicity of the law throughout christendom on the subject of marriage, that before the time of Pope Innocent the 3d, who died in 1216, there never had been any solemnization of marriage; but the man went to the house inhabited by the woman, and led her away to his own house. This was the only ceremony then used.

The common law also *presumes* marriage; that is, it presumes every man legitimate until the contrary be shown, as it presumes every man innocent and that every man obeys the mandates of the law, and performs his social and official duties, until the contrary be shown. Suspicions, or conjectures, or rumors, will not do to rebut this presumption; however strong the suspicions, specious the conjectures, or loud and general the rumors may be.

The common law, also, will *infer* a contract of marriage from circumstances. This is expressly declared in the cases which I have already quoted. In *Starr* v. *Peck,* (1 *Hill,* 270,) the parents had cohabited for some years, and the father, being a seafaring man, went away. During his absence the child was born; and a few days after his return a marriage was formally solemnized. The parents always treated this child as if she was legitimate. This was held, erroneously I think, sufficient to warrant a jury in finding that a *marriage in fact* existed previous to her birth, notwithstanding the ceremony which took place afterward.

A marriage will not be inferred where there are the impediments of pre-contract, consanguinity, affinity, or corporal or mental incapacity; but these are impediments which render any marriage liable to be declared void by a court of competent jurisdiction.

Thus the common law presumes marriage, and infers marriage from circumstances; but, although these principles of

the common law originated in the canon law, which at one time prevailed throughout christendom, yet we know that in many if not most of the nations of the continent of Europe, a formal solemnization became necessary to constitute a valid marriage.

At the time when the connection between Valentin Ferrie and the decedent subsisted, the law in France, relative to the solemnization of marriages, was very stringent, although, with regard to their dissolution it was exceedingly lax. It was provided that minors could not be married without the consent of their father or mother, &c., and all marriages contracted in defiance of this provision are declared null and of no effect. It abundantly appears from the testimony, that the father of Valentin Ferrie strenuously opposed his intended marriage with the decedent. This opposition was carried so far that Valentin was compelled to leave his house. He also was compelled to abandon his business connection with his father's tan-yard, and went to work with another relative.

The same law, however, in a subsequent section, requires that the *acte* of opposition shall be in writing, signified at the domicil of the parties, and to the public officer, who shall put his seal on the original ; and then there must be a judicial adjudication on the validity of the opposition, otherwise the objection has no legal effect. Nothing of this kind is shown ; no proof of any of the steps, necessary to a formal opposition, is attempted ; the *acte* of opposition, indeed, might have been presented and filed ; and so might have been the solemnization of the *acte* of marriage. It would be much safer to presume the latter than the former ; because the parties, notwithstanding the paternal remonstrance, changed their habitations, and published their reciprocal engagements and intention to marry, according to the law, on the 20th of the current month, before the proper officer. This was published aloud by word of mouth before the outer and principal door of the municipal hall of St. Girons ; and, if any thing is to be presumed, it is to be supposed, if the father persisted in his

opposition, that after this public declaration he would take special care to have his protest regularly recorded, without which it would have no legal efficacy. Valentin and the decedent continued to live together ; on the 30th of June, 1800, this child was born ; and on the same day he was baptized in the presence of his father ; Belthazar Ferrie being his godfather. This was the name of Valentin's father ; but whether he relented sufficiently to consent to be the godfather of this grandchild, is not shown, otherwise than that his name is inserted in the record ; and it does not appear that any other person of that name, of sufficient age, was at that time in existence. No legal opposition of the father having been established, we next arrive at the inquiry, whether in a country where the law requires the solemnization of a marriage, according to settled forms, in the absence of direct proof of this solemnization, it can be inferred from circumstances, as the common law allows in places where the common law prevails. This rule, I think, is not restricted by any consideration of the place where the contract was made. The *lex loci*, as to the manner in which the contract should be made, will undoubtedly prevail ; but the method of determining whether the *lex loci* was complied with, will necessarily be regulated by the *lex fori*. In other words, the rule of evidence will be governed by the *lex fori*. And as we have seen, no proof in our courts of an actual marriage is, ordinarily, necessary. This is solely required in prosecutions for bigamy, and in actions for criminal conversation. Is there, then, evidence sufficient, in the present case, to infer a marriage in conformity with the French law existing at the time ?

We are not without positive evidence on this subject. The declarations of the decedent herself are admissible, being connected with a question of pedigree, and not being made *post litem motam*. No controversy on the subject had been commenced when she made the declarations, and she unequivocally declared to Madame Grieser, and other witnesses, that she had been married in her youth, in France, in the revolutionary times, and that she had had a child in France, when she was

very young. *Is there any thing in the testimony fatally irreconcilable with this declaration?* Although the impression which she made in those early days upon the heart of Valentin Ferrie was not very deep, as subsequent events proved, yet he was evidently at the time greatly attached to her ; for her he forfeited the regard of his father, relinquished his place in his father's household, and was compelled to seek the means of support from a distant relative. At the same time, she left her employment as a domestic, and he the home of his youth ; and they became united in a household of their own. His father's opposition was not founded upon any defects in her character or moral principles ; but the objection was placed on the ground that she was in an inferior station of life. The Ferries were substantial trades people, she a poor domestic. Still Valentin openly lived with her, in the same town with his family, precisely as any man would live with his wife ; and in the way in which a young man, swayed by an overpowering sentiment, would live, fearing the displeasure of his father, and at the same time incapable of abandoning the object of his affection. They lived together at Benoz's, which was a reputable place. She was there called by the name of Ferrie ; Valentin spoke of her by the name of Ferrie ; he was present at the *accouchment;* he presented the child at the baptismal font ; they both went to see him at nurse ; the people of the quarter in which she lived called her Madame Ferrie ; she was called Madame Ferrie by Madame and Mr. Anere, in whose employment she was when she attracted the notice of Valentin ; Madame Anere manifested a great interest in her, and sent her things during her confinement. The witnesses, who speak of her as they knew her at this early period at St. Girons, know nothing against her reputation. She had no intercourse or intimacy with any other man than Valentin Ferrie. No circumstances are disclosed in the testimony to show that the relation subsisting between them was in any respect different from that of young married people, except the want of direct proof of a regular solemnization of marriage ; and it is evi-

Caujolle *v.* Ferrie.

dent that this was at least *intended*, from the fact that Valentin was compelled to abandon his father's house, because he persisted in declaring his determination to consummate his avowed intended marriage with Jane Icard; because they adopted a course of life in conformity with that intention; and because they formally published, as the law directed, their intention to be married at a specific time, previous to the birth of their child; and immediately after the birth of the child the rite of baptism was performed in the presence of the father; and if his grandfather was not the godfather, some other relative of the same name was. Indeed, according to the usage that prevailed universally throughout christendom, before the thirteenth century of the Christian era, their marriage was complete when they went to keep house at Benoz's. Their avowed intention to marry, consummated by their setting up a household and living together in fulfillment of that intention, would alone have perfected their espousals, without any further external act. Now, if our law allows us to infer a marriage from circumstances, why may not a marriage be inferred from the circumstances connected with this case. In one case, as we have seen, the parties had lived together for some time; a child was born; the father went away to sea; he returned, and some time after the birth of the child, a marriage was solemnized. It was held that the circumstances warranted a jury in finding a marriage of fact, *previous* to the solemnization. This opinion could not have been founded upon the circumstance that the parties continued to live together, and recognized the child as legitimate, *after* the solemnization. The fact of a previous marriage contract could be inferred only from the declared intention to marry, and from their actual cohabitation, with a view of fulfilling that intention. The conduct of the parties, subsequently to the solemnization of the marriage, can be accounted for only by reference to that event. This subsequent conduct cannot fairly be employed to prove an actual previous contract of marriage; but, on the other hand, the solemnization of marriage rather repels

the presumption of a previous valid marriage of any description. The circumstances in the case before us, showing the relation between the parties at this period, their courtship while Jeanne was at service, their intention to be married, Valentin's persistence in that intent, the consequent indignation of his father, their actual cohabitation in the manner in which they would have cohabited if they had been married, are all affirmative and primary ; while the evidence in contravention of the marriage consists of rumors, reports, suspicions, which are all consistent with a formal marriage ; direct proof of the solemnization of which at St. Girons might have been lost, or the parties might have solemnized their contract before the curé of some other place or parish, in order to avoid any open exhibition of the displeasure or opposition of Valentin's father. To employ the language of the court in *Starr* v. *Peck*, "the case bears no feature of heartless prostitution. The proofs are plain, that the object of both parties was marriage." But to these circumstances may be added the declaration of the decedent, namely, that she had been married at this period, which, as we have seen, is legal evidence in favor of this respondent ; and the fact that she was not formally married to Du Lux, until after the death of Valentin Ferrie, seems to corroborate the truth of this declaration.

Even if there were no regular solemnization in the precise manner directed by the French law, at that time, would their marriage contract be absolutely void? Now, only marriages contracted against the provisions of the articles in section 1, *tit. 4*, are declared "null and of no effect ;" and those articles relate only to the opposition of relatives, to cases where there is a pre-contract, to marriages between relatives within a certain degree, and where the parties are incapable of consent ; the same grounds, with the exception of the opposition of relatives, as would controvert the presumption of marriage according to the common law. With regard to the opposition of relatives, we have seen that it was never legally established. The manner of the celebration, then, according to the law

Caujolle *v.* Ferrie.

of France at the time, may be deemed only directory. The absence of the solemnization prescribed, did not make the marriage necessarily void.

On the whole, notwithstanding many difficulties in this case, notwithstanding much that is inexplicable and strange in the conduct of the decedent, and notwithstanding the want of that completeness of proof necessary to give full assurance to my convictions, I am of opinion that we are warranted from the circumstances, to pronounce in favor of an actual and sufficient contract of marriage between Valentin Ferrie and Jane Icard.

When to the inference from circumstances, and the declarations of the decedent, we add the presumption that the law invariably entertains in favor of marriage, the difficulty is considerably diminished. In the language of the decision from which I have already quoted, "we are to presume against a notorious act of immorality, almost as strongly as we would against the commission of a legal crime." And this may be a rational and true presumption even in France; for, although illicit cohabitation may be more common, and less disreputable in that country than in this, yet there is a disgrace attending it in all Christian lands, which must be repugnant, if not revolting, to every person not entirely lost to shame—to every person, especially to every woman, who possesses the smallest measure of self respect, or who in any degree cherishes that sentiment, which seems to be as deeply seated as any of the parental emotions—the desire to transmit to one's offspring an untarnished name. Unhappily, in all countries we have too many instances of this indifference to character, and this disregard for family honor; but, are we to presume it? Are we to establish it as a fact without evidence, and strong evidence? There is no reason, inevitably necessitating the presumption of illegal cohabitation in this particular case. Whatever might have been the conduct of the decedent in the subsequent part of her career, I think the evidence is sufficient to show that her conduct was correct at this early period, at Biert, Massat and St. Girons. There is

some evidence, indeed, which speaks lightly of her at this time; but it has plainly no foundation in the facts stated. The evidence in favor of her reputation, on the other hand, is decisive and direct. The witnesses who knew her at St. Girons concur in saying that her conduct there was that of a modest girl; and there is not a single word to show that Valentin Ferrie was a person of licentious morals. On the contrary, Daffis, his intimate friend, says, that he was " a respectable young man, industrious, and a good worker." " I never knew that he had any children or intimate relation with any other woman than Jane Icard." " Jeanne had no relation with any other man than Valentin Ferrie. I never heard any thing against her reputation with reference to other men here."

There is nothing disclosed in the testimony to show that her character was such as to warrant the belief that she would have consented to form an illicit and temporary connection with Valentin Ferrie, without, at least, the promise of a marriage; and every thing in his conduct shows that such an event was contemplated by him; for it is on this precise ground, as I have said, he defied the opposition, and disregarded the remonstrances of his father. This was his intention avowed to his family before he lived with her. Having, *pursuant to this intention*, left his father's house, and abandoned his business, why should we presume the absence of a marriage contract during the period they lived together, particularly when we find their language and behavior towards each other were such as usually indicate the relation of husband and wife? But, it is said that a marriage will not be presumed, where the connection was, in the first instance, illicit. This is, perhaps, as a general rule, safe, although it may be doubted whether even as a rule it has been generally acquiesced in. But, it is clearly not the rule when the connection, as in this case, has been formed pursuant to an actual promise to marry, and an intention to marry, repeatedly and publicly announced. There was a promise to marry, followed by a declaration to relatives and friends of an intention to fulfill the promise, and by a

Caujolle *v.* Ferrie.

public announcement that it would be consummated by a regular solemnization, as prescribed by law.

Whatever may be the conclusion at which an unbiased mind may arrive, after a careful examination of the testimony in this case, it cannot, as I have intimated, be unaccompanied with doubt. But, I think, much of this difficulty may be explained by giving due consideration to the mental and moral peculiarities of the decedent.

She presented a remarkable example of caprice, inconstancy, and irascibility. And yet she exhibited industry and application. But she was unstable in every thing, except her vanity and her love of money. If the respondent was indeed her son, why did she so repeatedly, for a great number of years, call him her nephew? and on the other hand, if he was indeed her nephew, why did she so persistently call him her son? At a very advanced period of her life, she had a horror of looking old, and of being thought old. Perhaps she was not singular in this; but, it certainly is unusual for a mother, or an aunt, to look with repugnance, or hate, on her son or nephew, for fear that the comparison between them would make her appear old. After a long interval of separation, and after manifesting a great desire that this respondent should be restored to her, she treated him in the most insulting manner, and compelled him to leave her house. At one time she expressed a great desire that he should have her whole property; at another time, that it should be given for public charity. Her temper was extremely violent, and she was continually engaged in quarrels. Possessing a fortune of over $100,000, she lived alone, in the garret of her house, in William street; and no doubt she would have been much better provided with the comforts of life, were she the inmate of an alms-house. Sometimes very agreeable; sometimes exceedingly disagreeable; now bland and affable; in an instant, without any apparent provocation, rude and insolent. Like the character in Martial's celebrated epigram, she was at once " touchy, testy, and pleasant." (*Difficilis, facilis, ju-*

*cundus, acerbus es idem.*)   These peculiarities of temper may, in some measure, account for the circumstance in her history, which casts the greatest doubt on the nature of her connection with Valentin Ferrie.   I mean her early separation from him. After a comparatively brief period she abandoned him, or he abandoned her; they parted, and never afterwards, to the period of his death, in 1811, does she appear to have evinced any wish to be restored to him.   And she exhibited the same indifference towards Du Lux, after his final separation from her.   She was evidently incapable of a profound or durable sentiment for any one; and, I think, it is more rational to impute the early dissolution of her connection with Ferrie to these defects of character, than to the want of a contract of marriage between them.

I had proceeded thus far in my inquiries, before I perused the final opinion of the surrogate.   We have arrived at the same conclusions, by a course, in some respects, different. With his usual care and discrimination he has fortified his position with the sanction of authority, from French and English jurisprudence; while I have trusted, principally, to fundamental principles, derived from natural and positive law. I have little hesitation in thinking, that the result is authorized by sound considerations of policy and practicability— considerations, to which, in questions of doubtful import, our law very commonly has recourse.   If positive proof of a conventional marriage were required in every case, there are few people who would not be exposed to the imputation of illegitimacy.   This would be still more frequently the result, where the marriage of a contestant's progenitors occurred at a remote period, in a distant country, or, like the principal events of this case, at an epoch of social commotion and fierce political strife.

In conclusion, to recapitulate, I do not entertain the least doubt, that the respondent was the son of the decedent, and of Valentin Ferrie.   I infer from the proof and the circumstances of the case, that a contract of marriage was entered

Caujolle *v.* Ferrie.

into between the decedent and Ferrie, which was consummated before or during the time they took up their abode, and lived together as man and wife, at the house of Benoz, at St. Girons; that even if the inference was not warranted by the circumstances, and by the positive declarations of the decedent, made at a time when she had no legal interest, or indeed no apparent motive of any kind, to utter a falsehood, or to refer to the subject, yet the presumption of law, in the absence of the canonical and other legal impediments of pre-contract, consanguinity, or affinity, &c., is so unreserved and emphatic that, on this ground alone, the decision of the surrogate may be safely sustained. I think that the evidence of the appellants is entirely devoid of that countervailing force which the law requires, to rebut its benign presumption in favor of marriage.

The proceedings before the surrogate should be affirmed with costs.

PEABODY, J. concurred.

MITCHELL, P. J. I dissent, principally, on the question of fact. The conduct of father and mother, to the child, was not such as would be exhibited to a lawful child; they both deserted him before he was four years old, and the mother never inquired for him until he was nearly twelve years old, and then, after she found him, let him (when he fled from her) remain without notice, until a miscarriage led her to seek him again. The father did not die until 1812, yet by 1804 she had formed a liason with Du Lux, which was continued until 1813, when she married merely to conform to the usages of this country. In all her correspondence before her marriage to Du Lux, she was described by her maiden name; she was so described in the various preliminaries to that marriage, and even when she stood at the altar before the priest of her religion at the ceremony of marriage, which is deemed a sacrament, in her church.

She never allowed Ferrie, the applicant, in his correspondence, to call her mother. He never did it; and when a friend

writing for him in his name called her so, he received a scorch-
ing rebuke. She distinguished him by a name by which ille-
gitimate sons are said to be recognized among certain classes—
"nephew." She never showed a mother's love to him; nor a
wife's devotion to his father. Unlike the case of *Starr* v.
*Peck*, (1 *Hill*, 270,) the mother and father did not live to-
gether until death separated them. They parted when the
fervor of passion had subsided. They did not bring up the
child as legitimate ; but each left him as an outcast—literally
as *nullius filius*—until a sense of duty compelling the mother
to look after him, she doled out a little of her money, but none
of her affection, upon him. All the *seeming* inconsistencies
of her conduct are explained, and are consistent, on the suppo-
sition that she knew that the sight of the applicant Ferrie was
a cause of shame to her, and revived the recollection of his
unlawful birth; that the name of *son*, as applied to him, was
a dishonor and a disgrace to her. . If she were married to Val-
lentin Ferrie, her life was a life of falsehoods; if she were not,
it is all consistent. Even the applicant, in his petition, could
not venture to call himself her son, but her son or nephew.

Although it is not necessary for a *child* to produce the *acte*
of marriage to prove his legitimacy, yet the absence of that.
record in a country where it is absolutely indispensable as be-
tween husband and wife, and where it is required by law, and
is the custom of the people, is strong evidence that there was
no marriage; and is only to be rebutted by strong proof. The
clearly established illicit connection between the father and
mother for over seven months before the birth of the child, is
a strong legal presumption that their subsequent intercourse
was of the same character.

If the mother is to be believed, she had a child—a son—when
she was but 15 years old, and that child died. If the child
died or was born when she was near that age, it was not this
applicant, for he was born when his mother was 23 years of
age. This would show (as the intimate companion and *confi-
dante* of her youth said of her at that period, and that she

Marsh *v.* Lowry.

knew it from her statements,) that years before she knew Valentin Ferrie, her conduct had been loose and gallant; and this also is consistent with her subsequent life; a woman of 22 years of age enticing a lad of 17, (as Valentin Ferrie must have been at the beginning of their intercourse,) cohabiting with him without any marriage, certainly until about a month before the child was born—then continuing with him, so far as the proofs show, only about two months after the birth—abandoning father and child within four years after the child was born, and forming a criminal connection with another, and continuing that connection until the remonstrances of others led her to marry the new lover. These facts overbalance all those in her favor; and others might be added. The father too—a worthy and industrious man, as he was esteemed, and living near the home of the child—neglected him to the day of his own death, from some short period after his birth.

Decree of surrogate affirmed.

[New York General Term, December 15, 1857. *Mitchell, Clerke* and *Peabody,* Justices.]