MICHAEL KEAVEY

*v.*

MARTIN BARRETT et al.

———

MICHAEL KEAVEY

*v.*

CATHARINE A. BARRETT et al.

[Submitted February 20th, 1901.   Decided September 4th, 1901.
Filed December 21st, 1901.]

1. In an action by a claimant of realty as heir of his mother, evidence by the claimant that he learned from his mother that he was born in Ireland, and after his father's death his mother emigrated to the United States, leaving him with his grandmother, who afterwards received money from his mother and stepfather to bring him to the United States, corroborated by others, and contradicted only by witnesses who are wholly discredited, is sufficient to establish his identity as such child.

2. Where realty is claimed by inheritance from a mother, and it was proved that plaintiff was born of such mother, lived with her, and was known by a name other than that of his mother's maiden name, that his mother declared his father died while claimant was an infant, and that he was recognized by her as her child and by her husband as a stepson, is sufficient, after such mother's death, to support an inference of legitimacy, as against such stepfather.

———

On bill, plea and joinder of issue thereon.

Two causes heard together by consent.

The parties to these two causes, and the subject-matter thereof, are the same.   The difference in them lies in the statement of different facts and the prayer for a different relief in each, such difference arising out of the difference in the facts.

The complainant, Michael Keavey, claims an undivided one-third interest in certain real estate in the county of Hudson

as one of the heirs-at-law of his mother, Bridget Barrett, deceased, subject to the tenancy by the curtesy of his stepfather, Martin Barrett, one of the defendants.

The allegation in one bill is that Martin has permitted the annual taxes on the premises to remain in arrear, and the prayer for relief is that he may be compelled to pay those taxes or lose his estate by the curtesy.

The allegation in the other bill is that certain assessments for benefits have been levied upon the lands in question and remain unpaid, and that complainant is ready to pay his share, but that the other two heirs-at-law—defendants—who are entitled to equal undivided parts thereof, have not paid their share; and the prayer is that they may be decreed to pay the same, or, in default of such payment, that the premises may be sold to pay the same.

The plea which has been put in issue and tried by evidence is that of Martin Barrett alone, and is the same in each cause, namely, that the complainant, Michael Keavey, is not *a child nor an heir-at-law* of the said Bridget Barrett.

The complainant joins issue on the plea in each cause.

Testimony was taken before a master, to be applied by consent to both causes, and they were brought on for hearing upon the issues so joined and the evidence taken.

*Mr. James R. Bowen,* for the complainant.

*Mr. Clement de R. Leonard,* for the defendant Barrett.

PITNEY, V. C.

The solution of the question raised by the pleadings affects only the defendant Martin Barrett and his interest in the estate.

The defendant assumed the burden of proving his plea, although that plea consisted in a mere negativing of one of the facts necessary to the support of the bills, and was himself the first witness sworn in support of it.

He swore that he was married to his wife, who was the mother of his children, forty-five years ago, which would make it in the

year 1855, at the Church of the Holy Cross, between Eighth and Ninth avenues, on Forty-second street, in the city of New York; that he knew his wife about two months before he married her by the name of Bridget Maloney; that she married him as such; that she told him before the marriage that she was a single woman and had never been married. Both were Irish, and the witness is illiterate; that he continued to live in New York for about ten years and then moved to West Hoboken, this state.

He swears that he knew the complainant and had known him for about twenty years, which would make it about the year 1880 and two years after the death of his wife, which latter event occurred in 1878; but he says that before he moved to West Hoboken—which was thirty-five years before the giving of his evidence—the complainant came to his house when he lived in Sixteenth street, New York, and went away again; that he never stayed at his house any length of time; that on the first visit he stayed about a couple of weeks. He further says: "I asked my wife at that time who he was, and she told me he was a *distant* relative to her." He said that he had been told that she had a son; that there was a rumor to that effect, and that he asked her if she had a son, and that she denied it and said she did not have a son. Then he was asked this question:

"*Q.* During the lifetime of your wife did she ever acknowledge to you that Michael Keavey was her son?

"*A.* No, sir; she did not; I put the question to her first, and she denied it."

He was seventy-five years old at the time of his examination. On cross-examination he says that Michael Keavey came to his house when he lived in New York; came there as a tramp, while they lived in Sixteenth street; that he must have been fifteen or sixteen years old; stayed at that time about a week. Then he says:

"When I first saw him I asked my wife who he was. I heard the rumor about my wife having a child before he first came to my house. A woman who used to come in the house told me. The woman is named Mrs. Sauer."

And that this was before he saw Keavey or asked his wife if she had had a child; said he asked her more than once before he saw Keavey, and that her answer was that she did not have any; that after that first visit of a week or two Keavey was very seldom at his house. Further, on cross-examination, he says he heard rumors from two persons that his wife had another child, one was Mrs. Sauer and the other Mary Sandford. This further question was put to him on cross-examination:

"*Q.* During the week that Keavey first stopped at your house did you ask your wife who he was?
"*A.* Yes, she told me he was a *distant relative* to her."

Further on he is asked these questions:

"*Q.* Did your wife ever tell you how Keavey was related to her?
"*A.* She told me that week he was in the house that he was a *near rela-tive* to her.
"*Q.* Did she tell you how nearly he was related to her?
"*A.* She did not."

The examination of this witness shows that it was directed distinctly and exclusively, as was in fact all the rest of the evidence produced by the defendant, to showing that the complainant was not the child of his wife. The question of legitimacy was not hinted at.

This witness further shows that he had two children, who survived his wife, John and William; that one of them died intestate without children, and that the other, William, married and died, also intestate, leaving a widow, Catharine Barrett, and two infant children, who are made defendants.

Catharine Barrett was sworn as a witness, says she was married to her husband on the 12th of May, 1888; that her husband died in 1898; that she had frequent conversations with Martin Barrett, and at none of them was Mr. Keavey spoken of; that she never saw the complainant at Mr. Barrett's house—she believes that her husband was acquainted with Keavey; that Keavey was never at her house, except on the occasion of her husband's death, and says that her husband never mentioned Keavey as a half-brother during his life.

The evidence of these two witnesses is thoroughly discredited.

The evidence of several apparently credible witnesses shows that the complainant and Martin Barrett were on intimate terms; that the complainant spent a good deal of time at Martin's house before he—complainant—was married, while he was a widower, and after a second marriage which he contracted; that the defendant Martin frequently spoke of him and introduced him to others as his stepson; that he spent some considerable time during the course of these years in complainant's place of business—a shop in which he carried on the business of a tinner; and further, that he conveyed premises to Keavey by way of mortgage in 1870; that he gave him a bond in 1887, and a mortgage to secure it; that he leased premises to him in 1897, and that he made a deed of lands to him in 1898; that he brought a suit against him in the municipal court of the city of New York, first district, and that he was sworn in that cause on July 18th, 1899, in the district court, No. 154 Clinton street, New York City, and there he testified as follows, in answer to his own counsel:

"*Q.* You do know the defendant?
"*A.* Yes, sir.
"*Q.* You married his mother?
"*A.* Yes, sir.
"*Q.* He is your stepson?
"*A.* Yes."

That in a foreclosure suit brought in the State of New Jersey, in 1899, by Michael Keavey against Martin Barrett and others, Martin Barrett, on January 25th, 1900, swore to a petition in which he said, "he made arrangements with the complainant, Michael Keavey, who is the stepson of your petitioner," to settle a "claim which Rohe Brothers had in connection with his daughter-in-law, Kate Barrett, the wife of his son William." And again, on January 25th, 1900, he verified an affidavit in that cause containing the following: "This deponent was utterly unable to obtain the money without assistance and trusted in his stepson, the said Michael Keavey to do so."

Catharine Barrett, on January 24th, 1900, made an affidavit in the same cause, saying:

"that she was in great distress and went to her father-in-law, the said defendant, and he agreed to sell the property No. 126 Weehawken street, in order to settle the matter; that this deponent did not know who to go to at first, but went to her *husband's half-brother*, the said complainant, Michael Keavey, and he proposed to take the property, No. 126 Weehawken street, and settle the matter."

A further affidavit in the same cause was made by her on January 29th, 1900, in which she says:

"She is the widow of William Barrett, who was the son of Martin Barrett, one of the defendants in this suit; that the said *Michael Keavey is the stepson* of the said Martin Barrett."

This evidence satisfies me, as I have before stated, that Martin Barrett's evidence is entirely unreliable, and that no confidence should be placed in it by a judge.

No proof worthy of the name, other than that of Michael Barrett, was offered to show that his wife married him by the name of Bridget Maloney; no entry in the church-books or record of marriages was produced in support of it, nor any certificate of marriage. A female, who, at the time of the marriage, was about five or six years old and lived with her parents in Brooklyn, who appears to have been acquainted with Mrs. Barrett, swears that she recollects of Mrs. Barrett, before her marriage, being called Bridget Maloney. This evidence is open to the remark that it is the recollection of a single individual of what occurred when she was a little child, and therefore to be received with great caution; and in the second place, that, under the circumstances presently to be stated, it would not be surprising if Mrs. Barrett, then very young, was, before she married Barrett, called by her maiden name, though really a widow.

In opposition to this evidence, the complainant swears that he learned from his mother that he was born on January 12th, 1849, in the town of Kilrush, County Clare, Ireland, a small seaport town on the Shannon river, a few miles west of Limerick; that his father died when he was an infant, and that when he

was two or three years old his mother emigrated to the United States, leaving him with his grandmother Maloney; that he lived with her until he was thirteen years old, which brought him to the year 1862, when his grandmother received money from his mother and stepfather to forward him to this country; that he came here in the care of two or three other male emigrants, and brought with him a large chest of clothing, in which was clothing for his stepfather, Martin Barrett; that he was met at the ship by his mother and stepfather (the defendant Martin), taken to their house, and lived with them from that time on—first while going to school, and afterwards made his home there when working out, sometimes sleeping and boarding away; that he was finally apprenticed to a tinsmith, acquired his trade, and then, when he became of age, went to Chicago and lived there some time, was there married, returned to the east, his wife refusing to live with him; that they had one child, which she kept until she died, when he took it; went into business for himself in New York City—opened a shop there—made his home in Hoboken, with his mother and stepfather, until he built himself a house there, married a second time, and lived there with his second wife and his child by his first marriage; that, before he married the second time, and while he was living east separate from his first wife, he made his home with Martin Barrett and his mother, during her lifetime, and with Martin Barrett after she died.

As I have before stated, he is supported in all that occurred in the United States by the evidence of several witnesses, who swear to this state of things, and to Martin Barrett's speaking of him as his stepson and introducing him to persons as such. I can see no reason why I should not give to the complainant's sworn statement the ordinary credit due to an intelligent, honest witness.

With regard to his origin in Ireland, he is supported by the evidence of three witnesses, all born and reared in Kilrush and who knew him there—two women and a man—who were from three to six years older than he.

These witnesses are, first, Catharine Sloane, whose maiden name was Catharine Galvin. She was six years older than the

complainant, and was related to him by marriage and knew him in Kilrush. She came to this country six or seven years before Keavey did, and when he was five or six years old. She saw him shortly after he landed, at Martin Barrett's, in Mrs. Bridget Barrett's lifetime; says that Keavey's mother visited her quite regularly, and that she visited Mrs. Barrett quite regularly, at one time spending three weeks at their house. The witness says that she was, at the time of giving her evidence, fifty-seven years old, which would make her born in 1843, six years before Keavey. She says she frequently saw Keavey at his grandmother Maloney's house, both before and after his mother came to the United States.

This witness is intelligent, and the dates she gives of the various transactions are consistent with each other.

Another witness is Mary O'Dea, whose maiden name was Mary Mahoney. She has known the complainant as long as she can remember; she knew his mother; saw him frequently in Kilrush; he lived close by her; he used to call to see witness's mother there; recollects when his mother came to this country; saw complainant in Kilrush after his mother came to this country; he lived with his grandmother and went to school from her place. She left Ireland after Keavey and remembers Keavey leaving. This witness is fifty-four years old, about three years older than Keavey. She visited Mr. and Mrs. Barrett, and saw Keavey at their house.

A third witness is Denis McMahon, who swears that he came to this country in 1866—which is four years after the complainant came; that he knew the complainant from the time he was two or three years old, at Kilrush, when he was living with his grandmother; that he knew his mother, Mrs. Barrett, in Ireland, and that she was then living with her mother, his grandmother, about six hundred feet from where he lived; that he had often talked with Keavey's grandmother; that Keavey's mother left Ireland before he did; that he often saw his mother in Jersey City after she married Barrett. This witness was born in 1842, and was seven years older than the complainant, and came here when he was twenty-four years old.

To this mass of evidence showing the identity of the com-

plainant with the recognized child of Mrs. Barrett, little or no
evidence in reply was given. Barrett himself was not put on
the stand to explain or deny any of the overwhelming proof
given to contradict his evidence.

As the case stands at this point there can be no doubt that
the complainant was the child of Mrs. Barrett. She recognized
him as such, and he was known as such in Ireland when an
infant, and was treated by his mother in this country as her
child.

The only remaining question is one as to his legitimacy. This
does not seem to have been in the mind of either of the parties
during the taking of the testimony. There is no direct proof of
Mrs. Barrett's marriage with Keavey's father. The complainant,
after this suit was brought, went to Kilrush and examined the
records of the old Catholic church there, as he says, to find out
"my birth and the marriage of my mother." He went to see
the priest of the parish at Kilrush.

"He told me to see the sexton of the church, who had been there longer
than he. The name of that sexton was Thomas Mahoney; he told me he
had gone over the books and found that the certificates of marriages and
births were kept very irregularly until 1862; some of his own family were
registered, while he, himself, and a brother, he could not find; he said
that from 1844 to 1849 times were so troublesome that no records were
kept. [It will be remembered that this was the time of the great famine
in Ireland.] I went over the records with him; I found no record of
the marriage of my parents, or of my birth or baptism; that is the only
Roman Catholic Church in that town. My parents were Roman Catho-
lics, and I am a Roman Catholic."

He further swears that a new church was built in the place
of the old church there when he was a child.

The three witnesses who testify to knowing him in Kilrush
speak of him as Michael Keavey. It appears, then, that he
took some name other than that of his mother's maiden name,
which was Maloney.

He further swears that his mother told him that his father
died when he was an infant; and a witness by the name of
Mary Farrell, who was a relative of complainant, swears that
she knew the complainant, and knew him as the son of Mrs.
Barrett; and further:

"I know that Mrs. Martin Barrett was Keavey's mother from what I heard my mother saying about it.  My mother is not alive.

"Q. What did you hear your mother say about it?

"[Question objected to.  Question allowed.]

"Appeal [this appeal seems never to have been argued].

"A. I heard my mother say that when Keavey's father died, his grand-mother had taken him, Keavey, and raised him until he came to this country."

The question, then, is whether, as against Martin Barrett, an inference of legitimacy can be fairly drawn from the bare facts that the child was born of his mother and lived with her and his grandmother, and was known by the name not of his mother, but presumably of some man; that, so far as appears, he was never known and considered as a bastard; that his mother declared that his father died when he was an infant, and that he was recognized by the mother as her child, and by the only defendant whose rights are now under consideration, over and over again as a stepson.

In considering this question I think we must treat the rule of law as perfectly well settled, that under such circumstances every presumption must be made in favor of legitimacy.  The old common law rule which excludes a bastard from inheriting from his mother under the old maxim that he is the "son of nobody," is a harsh one at best, and has, in nearly all the states, been abolished, and his *status* as the "child of his mother," with a right to inherit from her, been established by statute.  I believe the only exceptions are New York and New Jersey.  Here we give him his mother's personalty if she leaves no other children.

The harshness of the rule naturally does, and I think ought to, incline the court to adopt every reasonable presumption against illegitimacy and in favor of innocence and chastity.  Accordingly, we find that the books show that the presumption of legitimacy, aided as it is and must be in this case by a presumption of innocence and chastity, has been carried to great lengths.  The presumption is strengthened in this case by the death of both the father and mother; and that circumstance, of itself, has been held to preclude an inquiry into legitimacy. *Com. Dig., tit. "Baron and Feme," C. 6:*

"So, a marriage cannot be drawn in question upon any collateral sur-
mise, after the death of the parties. So, after the death of the husband,
the marriage shall not be drawn in question, though the wife be alive.
Nor after the death of the wife, though the husband be alive."

And further, under title "Bastard" (B) : "After the death
of the parties, the marriage cannot be drawn in question to
bastardize the issue."

Many instances of the application of this presumption are
given by Mr. Hubback in his treatise on *Succession,* and under
the title of "Evidence" he states the rule that hearsay evidence
and family repute, and the recognition of the issue as legitimate
by the parents, is competent.

Then it must be borne in mind, as was shown by Sir John
Nicholl in *Steadman* v. *Powell, 1 Add. Eccl. 58* (at *p. 64*),
that a valid marriage might be celebrated in Ireland in a private
house without a license. Hence—he held—slighter proof of
marriage was required in Ireland than would be in England after
the enactment of the English marriage laws. That case—*Stead-
man* v. *Powell*—was itself an illustration of the extent to which
the court goes in presuming legitimacy. There was no direct
proof of marriage in that case, nor any record of it, and it was
alleged, and there. was some proof tending to show, that the
parties to the marriage ceremony, if any was performed, were
Protestants, and that it was performed (in Ireland) in a private
room, without witnesses, by a· Catholic priest, and such a cere-
mony was declared to be absolutely void by an Irish statute,
and yet Sir John Nicholl sustained the marriage and ˙gave
administration of the deceased woman's estate to her alleged
husband, in the face of a will which she made as a single woman.
In that case he emphasizes the maxim—*semper præsumitur
pro matrimonio.*

I shall not attempt to cite all the authorities, but mention a
few. A leading and important case is *Piers* v. *Piers, 2 H. L. Cas.
331.* The complainants in that case—two females—claimed to
be heirs-at-law born in wedlock of Sir John Bennett Piers, an
Irishman entitled to an Irish estate. In his youth he had run
away with an Irish actress, and lived with her in open adultery

in the Isle of Man, and had several children by her besides the complainants. Previous, however, to the birth of the two complainants, who were his youngest children, there was evidence tending to show that a ceremony of marriage between him and his wife was performed, on a certain day in his private house, by an English clergyman, who was shown to be a man of dissolute habits and bad character. The statute of the Isle of Man rendered that marriage absolutely void, unless performed under a special license of the bishop. The person then bishop afterwards became bishop of Rochester, England, and swore positively that he never granted any such license; gave as a reason that he would not have done so, because he knew that Sir John Piers was living in open adultery with the alleged wife. No record of the marriage or of any license could be found. The lord chancellor of Ireland held, upon those proofs, that the marriage was a nullity. But the house of lords, advised by Lords Cottenham, Brougham and Campbell, unanimously reversed that decision, and held the presumption of law in favor of the marriage was so strong as not to be overcome by such proof. Lord Campbell uses language (at *p. 380*) which I will quote: "My lords, my opinion is that a presumption of this sort, in favor of a marriage, can only be negatived by disproving every reasonable possibility. I do not mean to say that you must show the impossibility of any supposition which can be suggested to support the validity of the marriage; but you must show that this is most highly improbable, and that it is not reasonably possible. * * * My lords, to avoid such a peril, the law requires that you should negative every reasonable possibility." And one reasonable possibility which he said was not negatived was that the previous bishop of Man might have granted a license years before the ceremony, which Sir John Piers held in his pocket until his wife again became *enceinte*. He further uses this language: "In the first place, I must draw your lordships' attention to the presumption of law which requires a judge not to exercise his own private notion or to indulge in his own private opinions upon the subject, but to believe that everything was solemnly and effectively done." Then, speaking of the speculation as to

30

whether or not a license might have been granted by the previous bishop, he says (at *p. 383*): "Your lordships will also bear in mind that I am not bound privately to believe either one speculation or the other. The question is, are they all satisfactorily negatived? I am not bound to believe that Dr. Crigan granted the license; but it is possible that he may have done so, and that possibility is enough for me to act upon, if it is not satisfactorily negatived."

The statement of the law made by Lord Lyndhurst, in *Morris v. Davies, 5 Cl. & F. 265,* was adopted. Speaking of the presumption of law in that connection, he says: "It is not to be broken in upon or shaken by a mere balance of probability; the evidence for the purpose of repelling it must be strong, distinct, satisfactory and conclusive." Applying that rule to the case in hand, I am bound to presume that Mrs. Barrett, then Miss Maloney, was married to the father of complainant before the latter was born. Such a fact is not only "reasonably possible," but highly probable.

Other cases are *Wilson* v. *Hill, 2 Beas. 143; Fenton* v. *Reed, 4 Johns. 52; In the matter of Taylor, a Lunatic, 9 Paige 611; Campbell* v. *Campbell, L. R. 1 H. L. Cas. (Sc. App., 1867) 182 (Breadalbane Case),* and *De Thoren* v. *Attorney-General, L. R. 1 App. Cas. 686 (1876).* These and other cases were referred to by me in the case of *Stevens* v. *Stevens, 11 Dick. Ch. Rep. 488.*

There is nothing in the famous case of *Voorhees* v. *Voorhees, 1 Dick. Ch. Rep. 411; S. C., 2 Dick. Ch. Rep. 315, 555,* which affects the present case. The court there simply held that where a cohabitation between a man and woman commenced and was founded upon a ceremony of marriage which was rendered void by reason of incapacity of one of the parties to contract, the court would not presume a second marriage, after the incapacity was removed, from the mere continuance of the cohabitation.

Besides these, I am indebted to counsel for complainant for the case of *In the matter of Matthews, 153 N. Y. 443,* which is much in point, and where some of the older cases, including *Caujolle* v. *Ferrie, 26 Barb. 177,* are cited. The *Matthews Case* was a contest between the children of a deceased half-

sister of the decedent and the children of her brother of the whole blood. The half-sister was the child of the mother of the decedent, born of her before her marriage with the father of the decedent and of the brother of the whole blood, so that it will be seen that the contest was substantially the same as that before the court in this cause. There was there no proof of the marriage of the common mother with the father of the half-sister. The surrogate held that the burden of proving that the half-sister was illegitimate was upon the brother of the whole blood, and that the absence of direct proof of marriage was not sufficient to sustain that burden. That ruling of the surrogate was affirmed by the appellate division of the supreme court of New York. *In the matter of Seabury, 1 App. Div. 231.* The court of appeals affirmed that ruling, and said: "We are of the opinion that, it having been established that the respondent's mother was a half-sister of the decedent, the law presumed that she was legitimate, and the burden of establishing her illegitimacy rested upon the appellants." The learned judge also quoted Judge Cowen, in the case of *Starr* v. *Peck, 1 Hill 270;* Judge Clerke, in the case of *Caujolle* v. *Ferrie, 26 Barb. 177,* and Judge Andrews, in the case of *Hynes* v. *McDermott, 91 N. Y. 451,* in which the presumptions I have referred to are all stated in the strongest manner. It is not necessary for me to repeat them here.

I am of the opinion that the pleas are not sustained by the proofs, and must be overruled, with costs.

I express no opinion as to whether the evidence already adduced is sufficient to maintain the issue as against the infant defendants, who have, by their guardian, filed the formal answers of want of knowledge, submitting themselves to the court.