OSBORNE et al. v. RAMSAY et al.

(Circuit Court of Appeals Ninth Circuit.   October 2, 1911.)

No. 1,980.

1. EVIDENCE (§ 290*)—DECLARATION AS TO PEDIGREE—LIMITATION OF RULE OF ADMISSIBILITY.

The exception to the general rule excluding hearsay testimony in favor of declarations respecting pedigree and lineage, in the absence of record evidence, is limited to declarations made ante litem motam, and not in anticipation of litigation depending on family relationship, and by members of the family, or at broadest by persons who, from intimacy with the family, were likely to have knowledge of the matters to which they relate.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1149–1152; Dec. Dig. § 290.*]

2. MARRIAGE (§ 40*)—PRESUMPTION—COHABITATION AND REPUTATION.

A presumption of marriage can only arise on the proven facts of both cohabitation and reputation.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 58–79; Dec. Dig. § 40.*]

3. DESCENT AND DISTRIBUTION (§ 71*)—PRESUMPTION OF LEGITIMACY.

To raise a presumption that a child was born in lawful wedlock, there must be a substantial basis upon which to predicate it.  There must be a marriage of a man with a woman either actual, reputed, or traditional, with the offspring proceeding from such marriage.

[Ed. Note.—For other cases, see Descent and Distribution, Dec. Dig. § 71.*]

4. DESCENT AND DISTRIBUTION (§ 71*)—HEIRSHIP—EVIDENCE—SUFFICIENCY—IDENTITY OF PERSON.

Evidence considered, and held insufficient to establish the identity of a decedent with the person of the same name through whom complainants claimed to inherit, or, if the identity be conceded, to show that decedent was a legitimate child of complainant's ancestor.

[Ed. Note.—For other cases, see Descent and Distribution, Dec. Dig. § 71.*]

Appeal from the Circuit Court of the United States for the Northern Division of the Western District of Washington.

Suit in equity by William C. Osborne, Eliza A. Elza, Louis D. Osborne, Louis B. Osborne, Charles E. Osborne, Clarence Osborne, Hester E. Hoag, Mary E. Davenport, Alfred W. Doty, Horace O. Doty, Susie Osborne, Mrs. Henry Burtis, Mrs. James Webb, Rufus E. Osborne, S. Wallace Osborne, William E. Osborne, Elida B. Rundle, Theodore S. Osborne, by his conservator, S. Wallace Osborne, Edith Bailey, Ella A. Hanford, Emma C. Osborne, Maggie I. Sparks, Robert E. Osborne, Minnie E. Heggeman, George I. Osborne, Mrs. Louis D. King, Anna E. Doty, Laura A. Doty, Frank L. Doty, and Howard W. Doty, against Claude C. Ramsay, Eben S. Osborne, and Charles F. Munday, as executors and trustees of the estate of James Osborne, deceased, and the City of Seattle.  Decree for defendants, and complainants appeal.  Affirmed.

This is the second appeal.  When the case was first here, the decision of the court was against the appellants.  167 Fed. 894, 93 C. C. A. 294.  But, upon

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes

their petition praying leave to file a bill of review on the ground of newly discovered evidence, a dismissal was ordered without prejudice. The bill of complaint in the present case is practically the same as in the first, the only material change consisting of an additional allegation contained in the seventh paragraph, to the effect that the first wife of the father of James Osborne died about 1824 to 1826, that the father subsequently married one Euphemia Rockwell, of Ridgefield, Conn., and that said James Osborne was the offspring of the union. Upon stipulation of counsel, the testimony of the former case was introduced in this in toto, and other testimony was taken. Briefly, the proofs, so far as they have material bearing, are in effect as follows:

Abraham P. Osborne, sometimes spoken of as Abram, but generally as Abraham, dropping the initial P., left four sons, namely, Lewis K., Solomon E., Clark H., and Horace, and one daughter, Caroline, who married Walter Doty. These children were the offspring of a marriage with Electa Hickock. The sons, after the death of Abraham's wife, went to live with their uncle, Northrop Osborne, a brother of Abraham, in North Salem, N. Y., which is 40 to 50 miles distant from Morrisania, in the same state. They continued to reside with their uncle until of age. All of them learned the mason's trade. The daughter lived with her aunt in New York City. Lewis K. Osborne resided at Tremont, N. Y., from 1849 to 1859, for 12 years at Danbury, Conn., for a time at Pelham, N. Y., and died at Tremont in 1896, at the age of 84 years. Solomon E. lived in East Norwalk, Conn., and died in 1901, at the age of 87 years. Horace died in North Salem, Westchester county, N. Y. Clark H. was born in 1819, lived in East Norwalk, Conn., and died there in 1895. Caroline died in East Norwalk also, 35 or 40 years prior to 1906.

S. Wallace Osborne, a son of Solomon E., says, from having heard his father and uncle Lewis talk, that he thinks the reason the boys went to live with their uncle Northrop was that his grandfather got married again: that the offspring of the marriage was a boy named James; that he (witness) was probably 10 or 15 years of age when he heard these declarations. Witness being of the age of 53 when his testimony was taken would put the time of his hearing the declarations in about the years 1863 to 1868. Witness also heard his father and uncle speak of the boy going to sea; they did not know of their own knowledge that he went to sea, but that was their belief.

Emma C. Osborne, a daughter of Clark H., testifies that she remembers hearing her father tell of his dying mother lifting him up on her bed and saying, "Clarkie, I wish I could take you with me"; that her father told her that his stepmother sent for him when dying, but he would not go; that her father was very young at that time, it being before he was married; and that she never heard her father speak of James Osborne in any way.

Annie Doty, aged 71, the daughter-in-law of Caroline, residing at East Norwalk, Conn., testifies that Caroline Doty and her husband lived with her and her husband about four years, and that in conversation with Caroline she always understood Caroline's father was married again, and had a family, but that she never heard her say of what the family consisted; that Caroline had very little respect for her father; and that after the death of her mother she never lived with her father any more, but lived with her aunt in New York City.

Mrs. Miranda M. Osborne, wife of witness S. Wallace Osborne, testifies that she heard conversations between her husband's father, Solomon E. Osborne, his uncle Lewis K., and William C. Osborne, a son of Lewis K., from which she gathered the information or impression that her husband's grandfather was married a second time and that a son was born of the marriage; that he disagreed with his father, and ran away and went to sea; and that his father was "wild, intemperate, and all that was evil." None of the persons engaging in the conversations alluded to by witness were speaking from any personal knowledge, but only from hearsay; the witness saying, in effect, that they simply talked and believed what they said, but did not pretend to know themselves personally. Witness further was of the impression that Lewis K. was the only son that saw his father after they went to their uncle Northrop's to live, and she did not know whether Lewis K. ever saw the stepmother or the child of the second marriage.

Mrs. Henry T. Burtis, residing at West Norwalk, Conn., the great-granddaughter of Abraham, testified that she had always heard, through members of the family that Abraham married again after the death of her father's grandmother, that there was a boy born to the marriage, and that his name was James.

Mrs. Elbert Brinckerhoff testifies that her mother married James H. Osborne, a grandson of Abraham; that she has heard her mother and Rosalinda Osborne, the wife of Northrop. converse concerning Abraham, and heard Rosalinda say that there was another child, and she, speaking confidentially to her mother's mother, wanted to know how he was situated; she had heard that he went west, and, if witness' mother knew where he was, she would like to know whether he was doing well.

Mrs. Dena Osborne, the wife of Wm. E. Osborne, a son of Solomon E., living at Brooklyn, N. Y., testifies that she has heard conversations between Solomon E. and Lewis K. Osborne, in which Father Osborne said that his father was married a second time, that there was a son of the marriage, and that his name was James.

William E. Osborne, son of Solomon E., testifies that he has heard his father say that the latter's father married again; that he has heard his uncle Lewis discuss the matter; that he (witness) was a small boy going to school at the time; that he further heard them talk of a boy that was born, whose name was James; and that witness' father at one time told about the boyhood of James, how the boys used to tease him, until finally he went away, being about 16 or 17 years old; and that nothing was heard from him.

Horace O. Doty, a son of Caroline, relates that he never heard his mother mention her father's name.

James R. Gray, aged 69, testifies: That he formerly lived at Morrisania, now known as Tremont, N. Y. That he knew Lewis K. Osborne, and once lived in his house. Both were members of the Methodist Church. That, if his memory serves him right, Lewis K. had a brother residing in Morrisania between the years 1850 and 1860, by the name of James Osborne. That Lewis K. said he was much annoyed by his brother's actions—that the latter did not care for church, that he would usually go from one beer saloon to another, and that one could almost always find him in a saloon or a cigar store. That James Osborne left Tremont, and went off on a voyage, and that witness has never seen him since that time. On cross-examination, when asked if he had ever seen the boy, he answered that he might have seen him, but, not having been introduced to him, he would hardly know him if he saw him. And, as to his going to sea, witness only knows what he was told—a sort of general impression that he went a number of times to sea. Witness knew his brother, with whom he was very intimate, and it was through him that he heard of the boy James.

William Cauldwell, aged 77, testifies: That he lived in Morrisania from 1849 to 1891. That he knew Lewis K. Osborne, who resided in Tremont, adjoining Morrisania, and that a relative of his lived right at the back door of witness' father's property, but that he could not tell who the relative was. That he knew another relative of his, a James Osborne, who he thought was a half-brother, but that they were not good friends. That along about 1852 the brother went away from Morrisania for the purpose, as Lewis K. told him, of pursuing a seafaring life. That he returned in about 1857, and came over and congratulated him (witness) on being elected supervisor of the town. That he told witness he was going away again; he thought he would go to California; that he was not on good terms with his half-brother; and it was unpleasant for him to be around. That witness got a letter from him in 1859, in which he said he was expecting to go north, with some cronies, to Puget Sound, to some such a place as Gamble; the name, being peculiar, impressed itself upon the mind of witness. The letter was written from Sacramento or San Francisco. On cross-examination, he relates that he did not know where James came from, that he did not know his father or mother, but that there was an Osborne living opposite to where witness lived, who, he presumed, was his father, because the boys Lewis and James were around there; that he thought James lived there because he saw him about

there more frequently than Lewis; that witness never talked with James Osborne much, only that he would just come over and say, "How do you do?" and then go on.

Harry Neggesmith, a detective, relates that he is acquainted with the older inhabitants of Morrisania: that he had been doing some professional work for the complainants, and visited 200 or 300 who had lived in Morrisania for years; that from 150 to 200 old-timers were yet living in the immediate vicinity who were living there between 1850 and 1860; that he found two men who recollected James Osborne, namely, Gray and Cauldwell, and a few others recalled that Lewis K. Osborne had a brother, and heard him speak of his brother; and that those old people were very misty about their recollection of the Osbornes. The only other thing he found that would seem to identify James Osborne was that the custom house record showed that a man by that name had shipped for a voyage.

Lyman B. Andrews, residence Seattle, Wash., testifies that he was acquainted with James Osborne, first meeting him in 1863 or 1864; that he conversed with Osborne, who told him he resided, before coming west, near the city of New York, in Westchester county, in the locality of the Bronx, but whether he stated he lived at the Bronx witness could not say; that Osborne said his mother had died when he was quite a lad, well along in the teens, and that his father was then living; that he (Osborne) did not do well in getting ahead, and went to sea, going to Havre, France; that he was away three or four years, perhaps longer, and when he returned he found his father dead; that he did not remain long at his old home, perhaps three or four months, and then left for a trip around Cape Horn, landing in San Francisco, and afterwards coming on to Puget Sound; that he came directly to Port Gamble, which was in about 1859; that he resided at Port Gamble four or five years, and then came on to Seattle; that according to witness' recollection Osborne said he had some half-brothers, but did not say much about them, only that his relationship with his half-brothers was not very pleasant.

Winfield S. Jameson, of Seattle, thinks he heard Osborne say he came from Westchester county, the town of Morrisania; that he spoke of having gone to sea on a voyage, to Havre, France, and having returned from France; that he conveyed the impression that he had no use for his relatives; that he came around the Horn to San Francisco, then to Puget Sound, in a sailing vessel.

A letter was introduced in evidence, dated at Mobile, August 8, 1835, which bears the indorsement, "Copy of a letter written to my father residing in St. Louis, Missouri." It is signed, "Lewis K. Osborne." The letter is set out in the former opinion rendered in this cause, with the omission of a portion deemed unimportant.

This is the evidence given at the former trial. The following is a brief résumé of that adduced in addition at the second trial:

The name Abraham P. Osborne, shoemaker, at Market and Water streets, appears in the New York City Directory (Longworth's), 1820, 1821, 1822-23, and Abraham Osborne, cord-wainer, Eldridge street, New York, 1826-27 and 1827-28. The name Lewis K. Osborne, mason, 172 Orchard, appears also in the same directory, running in date in 1836-37 to 1842-43, and in a directory published by John Doggett from the latter date down to 1850-51. In a book entitled "Simon Lobdell, 1646, of Milford, Connecticut, and his descendants" is found this entry: "A. 21. III. Abigail Frances, b. 5 Jan. 1820, D. 20 Sept. 1887, at Norwalk, Conn., m. 20 Nov. 1841, North Salem, Clark Hickock Osborn, b. 8 March 1819, in New York City, d. 2 Jan. 1895, at Norwalk. Was son of Abram Purdy Osborn and Electa Hickock, his wife. The family were all Episcopalians."

In another book entitled "A Genealogy of the Families of John Rockwell, of Stamford, Conn., 1611, and Ralph Keeler, of Hartford, Conn., 1639," is found this entry:

"Thomas Rockwell, born South Salem Nov. 23, 1774; married July 20, 1795, Deborah Townsend. They lived in South Salem. They had one daughter, Permelia, who was a teacher in Brooklyn, but could not be found. He died at South Salem about 1834-5."

Charles W. Tarbox, aged 60, residence New York City, 1877 Washington avenue, a real estate expert, testifies that he was acquainted with one Lewis K. Osborne from 1851 or 1852 to 1860, who lived in Morrisania or Tremont, or one of the local names included in the Bronx; that he lived on what is now Tremont avenue: that witness knew him from the time he (witness) was about the age of four, because he was a frequent visitor at witness' father's house; that he was a builder; and that witness knew of no other person by that name in that vicinity; but that he knew a William Osborne, who had a family, and who was no relation to Lewis K.; also, a John Osborne, who lives in Tremont now.

Angeline A. Brown, aged 59, East Norwalk, Conn., testifies: That her mother's name was Besty Ann Hickock, who was a niece of Electa Hickock. That Electa married Abraham P. Osborne. This she heard her mother say, also her two aunts. That she had heard them talk about it a good many times. That her grandaunt Electa is dead, and that she heard her mother say that Abraham married again after the death of her grandaunt. That she also heard this discussed by her aunts; they being Miss Sarah Fenning, of Danbury, and Mrs. Warren, of Norwalk. That Abraham married Euphemia Rockwell. That witness' mother always said her name was Euphemia, but that they called her Phemy for short, and that witness could not recall where Phemy Rockwell was from. That Abraham was a shoemaker, but that she did not know where he lived. Witness further testifies that she thinks her aunts knew Abraham personally, and that she has heard her mother say that she knew him, which was at Ridgebury or Ridgefield. Witness has no recollection of hearing Euphemia Rockwell's relationship discussed in any way.

Matilda A. Warren, 41 Van Zandt street, East Norwalk, aged 68, testifies: That her maiden name was Hickock; that she is a sister of Mrs. Brown, and that Electa Hickock was her father's sister, but that witness never saw her. That, from conversation with her father's family, she learned that Electa married Abraham P. Osborne. That her father, mother, and aunts have always talked about that. From the same source she learned that Electa is dead, having died before the witness was born. That from the same source she heard that Abraham married again, but not right away, and that he married Phemy Rockwell, of Ridgebury, Conn.; Thomas Rockwell being her father. That witness' father, mother, and aunts personally knew of the second marriage. That Abraham was a shoemaker, and that her father was in business with him for about five years in New York. That Phemy Rockwell lived in Ridgebury until Abraham came and took her down to New York to work for him. That this was before the death of his first wife, and Phemy worked for and took care of his first wife while she was sick. That at that time witness' father was in business with Abraham. That it was when her oldest sister was five years old they dissolved, and her sister is now 89, which would make it in 1825. That Abraham was a very hard drinker. That he knocked witness' father down once, and that broke the partnership, and that Abraham was always rather a dissolute character. That after the partnership was dissolved Abraham lived in New York about two years, then went away, and nobody ever heard of him afterwards. That she was told he went west. That neither witness' father nor her aunts were at the wedding, nor did they claim to have had personal knowledge from having witnessed it. That her aunts all knew Euphemia in Ridgebury. That Euphemia took care of Abraham's wife for a year before she died. That Euphemia did not return from New York, but remained at the house of Abraham after his wife's death, and that there was quite a scandal about it. It was then that the children were taken by Northrop Osborne to North Salem.

L. B. Andrews, recalled, further testified that James Osborne once said to him that his (Osborne's) father was a shoemaker.

Charles K. Jenner and Solon T. Williams, for appellants.

Charles F. Munday and Scott Calhoun, for appellees.

Before GILBERT and MORROW, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge (after stating the facts as above). The testimony submitted at the former trial was clearly analyzed by the opinion heretofore rendered, and it was found that the plaintiffs had not established the kinship alleged to exist between James Osborne, deceased, and themselves. The question then presented, and now again presented, was and is whether James Osborne was a half-brother, by a second marriage of Abraham P. Osborne, to Lewis K., Solomon E., Clark H., Horace, and Caroline Osborne. It is not disputed that these last named are the children of Abraham by a lawful marriage, and that James is not their whole brother. The sole contest is whether he is their half-brother by a subsequent lawful marriage of Abraham. When the case was here before, the court said:

"We know nothing whatever of the second wife. Her name is not given, and there is no information concerning her marriage to Abraham Osborne, nor is there any evidence of cohabitation or a reputation in the community where they resided or had their home that they were husband and wife, or that they were generally recognized and received as such by their neighbors and acquaintances. What there is at most is a mere tradition that Abraham Osborne was married a second time, and that by this second marriage there was issue, a boy named James."

It is now urged on the part of plaintiffs that the additional testimony adduced at the present trial supplements the former, and that its effect is to establish a case wherein the former came short. That is to say, in the present case that a second marriage of Abraham has been established, and that James was an issue of that marriage; or, rather, that the newly adduced testimony, taken in connection with the old, is effective to show those facts.

Before proceeding to a further analysis of the testimony and a consideration of its probative effect and bearing, we will, in view of the discussion of counsel, determine the legal principles deemed applicable.

[1] It is a well-established exception to the general rule that hearsay testimony of a certain type is admissible to establish lineage and pedigree. This is because of the necessity of the case. In previous conditions of society and the family relations, records have not always been kept of marriages, births, and deaths, and in order to establish relationship, when a generation or more had passed away, it has been necessary to resort to family history and tradition, and to learn of those who have talked and spoken as circumstance and occasion suggested, though not under oath, of the family ties and kinship as they were supposed to exist within the knowledge or memory of the person speaking. It is perhaps not the best evidence; but where record is silent, or there is none, it is the only available evidence, and resort must be had to it to establish ancestry, line of descent, and pedigree. Cuddy v. Brown et al., 78 Ill. 415. It is a rule, which has the approval of the Supreme Court, that hearsay evidence of the kind respecting pedigree and lineage is limited to members of the family, who may be supposed, and are the most likely, to have known the relationships which in reality existed in its different branches. Stein v. Bowman, 13 Pet. 209, 10 L. Ed. 129. See, to the same purpose, In re Hurlburt's Estate, 68 Vt. 366, 35 Atl. 77, 35 L. R. A. 794. The broader statement

of the rule is that statements respecting lineage, in order to be admissible, must proceed from persons "who from living in habits of intimacy with the family or from other peculiar circumstances are likely to have known the facts concerning which their declarations are offered." Westfield v. Warren, 8 N. J. Law, 249, 250.

Such declarations must also have been made ante litem motam, and not in anticipation of litigation or contest depending upon the family relationship.

[2] A presumption does not arise in nebula, but must be predicated upon some real or substantial basis. A presumption of marriage, therefore, must be based upon facts proven. Thus, as stated in Cargile et al. v. Wood et al., 63 Mo. 501, 512:

"Where parties have cohabited together and held themselves out as man and wife, and there are circumstances from which a present contract may be inferred, the law, out of charity and in favor of innocence and good morals, will presume matrimony. The law in general presumes against vice and immorality, and on this ground holds acknowledgment, cohabitation, and reputation presumptive evidence of marriage."

"But upon doubtful facts," says the court in Peet v. Peet, 52 Mich. 464, 467, 18 N. W. 220, 221, "the court ought to presume a lawful marriage rather than a notorious act of immorality."

This, it must be observed, where the parties have been living as if in lawful wedlock.

Thus is substantiated or established the fact of marriage, or rather thus proceeds the presumption of the fact, from general reputation or repute of marriage, which in its application to the fact of marriage is even more than hearsay. It involves and is made up of social conduct and recognition, giving character to an admitted and unconcealed cohabitation. Badger v. Badger et al., 88 N. Y. 546, 42 Am. Rep. 263.

So it is necessary, unless it be that the fact of marriage is otherwise proven, that there be evidence both of cohabitation and reputation before such a marriage can be presumed. Proof of one alone is not sufficient to sustain the presumption. Taylor v. Taylor, 10 Colo. App. 303, 50 Pac. 1049, 1050; Smith v. Fuller (Iowa) 108 N. W. 765.

The facts of marriage, birth, and death may also be proven by family history or tradition incident to the establishment of lineage or pedigree. 2 Wigmore on Evidence, § 1605. As is said in Westfield v. Warren, supra:

"One of these (exceptions to the general rule) is found in questions of pedigree. There, declarations of deceased members of a family as to marriages, as well as births and deaths, are admitted. The evidence of the marriage, however, is in such case but incidental to the proof of pedigree. And to such extent only, to the admission of such evidence for such purpose merely, is the exception limited."

And again it is said by Lord Mansfield, in the Berkeley Peerage Case, 4 Camp. 401:

"In matters of pedigree, it being impossible to prove by living witnesses the relationships of past generations, the declarations of deceased members of the family are admitted; but here, as the reputation must proceed on particular facts, such as marriages, births, and the like, from the necessity of

the thing, the hearsay of the family as to these particular facts is not excluded."

See, also, In re Hurlburt's Estate, 68 Vt. 366, 35 Atl. 77, 35 L. R. A. 794, from which the above quotation from Lord Mansfield is made.

[3] Authorities are to be found extending the rule of repute or tradition as to marriages, births, and deaths beyond the family relationships; but as to their soundness upon principle we are not called upon to determine at this time. So it must be with the presumption that a child is born in lawful wedlock. There must be a substantial basis upon which to predicate the presumption. There must be a marriage of a man with a woman, either actual, reputed, or traditional, with the offspring proceeding from such marriage. In this relation, the case of In re Pickens' Estate, 163 Pa. 14, 29 Atl. 875, 25 L. R. A. 477, is instructive. In that case there was family tradition that the mother was married to John Obenstein, and lived with him three years, prior to her marriage with Samuel Pickens, and that Benjamin Obenstein, through whom the contestants on one side claimed, was a son of such marriage. By the same tradition it was shown that the mother later married Henry Pickens. In its comments upon the case the court says:

"There was no distinct evidence of a marriage to either, but presumably she was the lawful wife of each. Such a presumption is entirely consistent with the facts as established by the testimony; but, if conflicting presumptions arose, that in favor of innocence and legitimacy would prevail."

Here then was a basis for deducing the status of legitimacy. The law goes even farther than this, and will presume lawful marriage to support the presumption of legitimacy, which is a presumption upon a presumption, and is not ordinarily permissible. The basis of the first presumption is that in a Christian country a lawful rather than a meretricious union must, prima facie, be taken to obtain, and therefore that the progeny, when traced to the father or the mother, without showing union by marriage, will be presumed to be legitimate. Thus, where it is shown that a certain person is the son of a certain other person, it will be presumed, for the sake of legitimacy, that the latter was lawfully married, and that the son was born in lawful wedlock. McClaskey v. Barr (C. C.) 47 Fed. 154.

This, however, was where there was an absence of any negative evidence to dispute the fact of marriage.

See, also, Locust v. Caruthers, 23 Okl. 373, 100 Pac. 520; Keavey v. Barrett, 62 N. J. Eq. 454, 49 Atl. 1073.

[4] Keeping in mind the legal principles thus ascertained, we will recur again to the testimony. It has been substantially shown that the decedent, James Osborne, came from the locality of the Bronx, Westchester county, N. Y., about the year 1857, by way of San Francisco, to Puget Sound, arriving there about the year 1859. This comes from his own statement, as shown by a reputable witness. He was probably born in the year 1835. That fact is alleged, and does not seem to be disputed. According to his own statement, his mother died when he was quite a lad, well along in the teens. His father died

later, and while he was away at sea. He went to Havre, France, on the voyage, and was gone three or four years, perhaps longer. On his return, he did not remain long, but entered upon another voyage, westward by way of Cape Horn. Osborne also said he had some half-brothers, but that his relations with them were not very pleasant. There is evidence in the record, traditional in character, to the effect that Abraham P. Osborne had a son named James; that James went on a voyage to Havre, France; and that he went away again on a voyage, and was not heard from afterwards; and, further, that Abraham was married a second time; and that James was the offspring of the union thus consummated.

This court, in its opinion in the former case, found that there was a failure of identity; that it was not satisfactorily shown that the decedent was the James Osborne, son of Abraham P. Osborne. Attempt was made, as here, to show by one William Cauldwell that the James Osborne that came west was a half-brother to Lewis K. Osborne, but it resulted in proving by all reasonable probability that the Lewis K. Osborne of whom Cauldwell speaks was not the son of Abraham P., but another person altogether. Lewis K., the son, at the time of which Cauldwell speaks of first meeting James, was a man 38 years old, and James was 15. At the time James is said to have gone to sea—1852—James would have been 17 and Lewis K. 40 years of age, and yet Cauldwell speaks of them as the boys, Lewis and James. When the testimony of Cauldwell is read in connection with that of Gray, it is made still more apparent that the Lewis K. whom Cauldwell knew was not the Lewis K., son of Abraham.

The more recent testimony does not serve to clear up the discrepancy, and to connect the James who came west with Lewis K., the son of Abraham. It further appears from such testimony that Abraham P. Osborne first married Electa Hickock. Two witnesses are called, namely, Angeline A. Brown and Matilda A. Warren; the former being a daughter of Betsy Ann Hickock, who was a daughter of the brother of Electa. The first of these witnesses says that she has heard her aunts, Mrs. Warren (the witness) and her sister Sarah Fenning, say that Abraham married Euphemia Rockwell, whom they called Phemy for short. She could not recall where Phemy was from. Abraham was a shoemaker, but witness did not know where he lived; she thinks her mother and aunts knew Abraham personally. Mrs. Warren relates that, from conversations with her father's family, her father being a brother to Electa, the wife of Abraham, she learned that Abraham married again, but not right away; that he married Phemy Rockwell, of Ridgebury, Conn., the daughter of Thomas Rockwell; that witness' father, mother, and aunts personally knew of the second marriage, but were not at the wedding, nor did they witness the ceremony. Then it is related that Abraham took Phemy Rockwell from Ridgebury, Conn., down to New York to work for him, before his first wife's death, and that she took care of his wife for a year. This was about the year 1825. It is further related that Euphemia did not return from New York, but stayed at the house of Abraham after his wife's death, and there was quite a scandal about it, and then it was

that the uncle Northrop took the children to North Salem. It further appears that Mrs. Warren's father was in business with Abraham in New York about the time the latter's wife died, and so continued for four or five years, and that about two years after that Abraham went away to the west, and nobody ever heard of him afterwards. This statement that Abraham went away and was not heard of again is corroborated by Longworth's New York City Directory, which shows the presence of Abraham P. Osborne, shoemaker, in New York from 1820 to 1823, and Abraham Osborne, cord-wainer, from 1826 to 1828, but not later. And the letter written by Lewis K. from Mobile, addressed to him in St. Louis, in 1835, would indicate that he went west. So it must have been along during the years 1820 to 1828, or thereabouts, that Mrs. Warren's father was in partnership with Abraham in New York. In about two years after the dissolution of the partnership, Abraham disappears westward, and is not heard of again. Now, James was born about 1835. There is but meager testimony to show that Abraham ever lived in Morrisania, or Tremont, which is adjoining. William E. Osborne says that, while the boys were living with Northrop Osborne, Abraham lived in New York—William did not know exactly where, but down near Tremont, in the neighborhood of the Bronx. Gray evidently knew nothing about him, and Cauldwell, who says he lived in Morrisania from 1849 to 1891, and was in public life a great deal of the time, says he never heard of Abraham Osborne. Yet he says there was an Osborne who, he presumed, was the father or uncle of James, who lived opposite him, Mrs. Warren does not say that Abraham ever lived at Morrisania. In speaking of Euphemia Rockwell, she says that Abraham came up to Ridgebury, Conn., and took her down to New York to work for him, but mentions no place in New York City. It is significant that neither Mrs. Brown nor Mrs. Warren ever heard of a being born to the second marriage; and manifestly Mrs. Warren had a better opportunity of hearing of such a thing than any of the other witnesses.

In all the time James was known in Seattle, so far as the testimony goes, he never mentioned the name of his father, or said it was Abraham Osborne. So that in the present case, as in the former, there lacks identity of James Osborne of Seattle as the son of Abraham Osborne, who was the father of Lewis K. Osborne, Solomon E., and others.

The case might well be dismissed here, but we will examine further relative to the alleged second marriage of Abraham, to Phemy Rockwell. Both Mrs. Brown and Mrs. Warren testify, from what they heard, that Abraham married Euphemia Rockwell, of Ridgebury, Conn., and that they called her Phemy for short. For corroboration of this testimony, an entry from the Rockwell and Keeler Genealogy was introduced, which shows that Thomas Rockwell, of South Salem, and Deborah, his wife, had a daughter Permelia, "who was a teacher in Brooklyn, but could not be found." For this it is claimed that Permelia was nicknamed Peme, and that this was subsequently corrupted into Pheme or Phemy, and that Permelia is the same person who married Abraham. The Rockwell and Keeler Genealogy refutes the

probability of this marriage. It shows, among other things, that Chloe Osborne, a daughter of Gamaliel and Dolly Keeler Osborne, married Lewis Keeler. Gamaliel was the father of Abraham and Northrop Osborne, so Chloe was therefore their sister. The genealogy further shows that the Rockwells, the Keelers, and the Osbornes, in the generations running to the eleventh, married and intermarried many times, and yet this book, which seems to have been very carefully and exhaustively compiled, contains no mention whatever of the marriage of a Rockwell to Abraham Osborne. It is suggested that the members of the family would have no desire to perpetuate in their family history the marriage of Permelia to a man of such evil repute. It may be answered that, if Euphemia was Permelia, there was a scandal with Abraham after his wife died, and it would have shown a more regular life, to say the least, to have noted the marriage in the genealogy. We must presume, however, on the trustworthiness of the book, and that it contains all the information touching the family relationships that the authors could, by reasonable diligence and inquiry, obtain. The book itself bears the imprint of great thoroughness and detail.

But this aside, counsel say, "We claim that the question whether James Osborne's mother was Permelia Rockwell, Euphemia Rockwell, or any other woman, is immaterial to the issues of this cause, for the reason that complainants do not claim through the blood of the mother," and argue that James was born of some woman, that the proof is convincing and absolute that he was recognized as the son of a common father by the other children, and that James recognized the first children as his brothers and sisters, and that in such a case the law will conclusively presume that the son was born in lawful wedlock.

This brings us back to the presumptions of marriage and legitimacy of offspring. It should be remarked that James never, as appears from the testimony, recognized Lewis K. and his brothers and sister as his (James') half brothers and sister. Andrews says:

"My recollection is he said he had some half-brothers, either one or two or more. He did not say much about them, only that his relationship with these half-brothers was not a very pleasant one. That is about all he ever said about it to me."

Nor did he give the names of any of them. Neither does Cauldwell, whom, from the inherent stamp of his testimony, we do not deem altogether trustworthy, even say that James ever said that Lewis K. was his brother. Cauldwell does say that Lewis K. spoke of James as his brother; but we have heretofore discussed the improbability as to the identity of this Lewis K. that he speaks of, as a son of Abraham. So it is that James may have had half-brothers, and yet not have been the half-brother of Lewis K., Solomon E., and the rest.

There is lacking in the case any testimony of the living together of Abraham with any woman since the death of his wife Electa, or any repute that he was married to any one, although, if he lived in Tremont or Morrisania, it would more than likely have been within the reach of complainants to show it. So that all presumption of Abraham's marriage to another woman on this basis is entirely wanting.

There is yet left the mere tradition that he was again married. But this is refuted by the strongest probability, even conceding that James was his son.

A deep mystery hangs about the deportment and life of James. We find him residing in the city of Seattle for the space of 17 or 18 years, where he prospered and became wealthy, and at no time does he disclose the name of his father or of his mother. He let it be known that he had one or more half-brothers, but at the same time he let it be known that he was not on good terms with them. Then when he comes to write his will, which is most specific and complete in every detail, as he seemed to want it, he makes no mention of any relative of any degree. If, therefore, Euphemia Rockwell bore any relation to Abraham Osborne, and James was the son of Abraham, the scandal which arose after the death of Electa was evidence of the relationship between Abraham and Euphemia, and in all probability James was born out of wedlock. He probably felt the misfortune of his birth, and hence his constant and persistent effort until the day of his death to conceal from his most intimate friends and associates the identity of his parentage. So that the presumption of legitimacy, based upon the presumption of lawful wedlock, is adequately overcome by the testimony showing a probable status to the contrary.

Thus, viewing the case in all its bearings, and giving due weight to the presumption of lawful wedlock and legitimacy of offspring, we are still of the opinion that the proofs do not sustain the complaint.

The decree of the Circuit Court will therefore be affirmed.